EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMONITA SÁNCHEZ LUGO, acusada y apelante.

*Número:* CR-67-276      *Resuelto:* 2 de octubre de 1968

492

*Ildefonso Freyre,* abogado de la apelante; *Rafael A. Rivera Cruz, Procurador General,* y *Juan José Ríos Martínez, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El fiscal presentó ante la Sala de Mayagüez del Tribunal Superior, una acusación contra la apelante Ramonita Sánchez Lugo atribuyéndole la comisión de tres delitos definidos por la Ley de Armas de Puerto Rico, 1951, a saber:

1ro. Infracción del Art. 8, delito grave, consistente en que en el día 24 de febrero de 1967, y en Mayagüez, ilegal, voluntaria y maliciosamente, *portaba, conducía y transportaba un revólver* cargado, para fines de ofensa y defensa, sin tener una licencia al efecto expedida para portar armas por la Sala del Tribunal Superior de su domicilio, ni por el Jefe de la Policía de Puerto Rico, siendo dicho revólver un arma de fuego con la cual puede causarse grave daño corporal.

2do. Infracción del Art. 6, delito menos grave, consistente en que en la fecha, sitio y circunstancias expresadas, ilegal, voluntaria y maliciosamente, *tenía en su posesión y dominio el mismo revólver* sin haber obtenido previamente una licencia expedida por el Jefe de la Policía de Puerto Rico para la posesión del mismo, ni por el Tribunal Superior, Sala de Mayagüez.

3ro. Infracción del Art. 32 (a), delito menos grave, consistente en que "La referida acusada, en la fecha, sitio y circunstancias antes expresadas, ilegal, *voluntaria, maliciosa e intencionalmente*, hizo varios disparos de revólver, que es un arma de fuego, en presencia de personas que podían recibir daño corporal, sin ser ello un caso de defensa propia y sin estar la referida acusada en el desempeño de funciones oficiales de clase alguna."

El juicio sobre los tres cargos se celebró conjuntamente el 22 de junio de 1967, con la intervención de un jurado en cuanto al primero de ellos, y con la intervención del tribunal de derecho respecto al segundo y tercero, ambos delitos menos grave.

El jurado rindió veredicto absolutorio respecto a la portación, conducción y transportación del arma cargada.

Luego de ser leído el veredicto el juez que presidió el juicio la declaró culpable de los cargos menos graves, haciendo las siguientes expresiones:

"HON. JUEZ:

Las otras están sometidas a la consideración del Tribunal, por el Tribunal de derecho. Lamenta el Tribunal tener que expresar que no concurre con el jurado en su criterio, y en cambio entiende que hay pruebas fuera de toda duda razonable para declarar culpable a esa señora y por lo tanto en la causa M-67-242, la declara Culpable de una infracción al artículo 6 de la ley de armas, delito menos grave. Y en la causa M-67-243, la declara Culpable de una infracción al artículo 32(a). En cuanto a la fecha para la imposición de la sentencia. Siéntese allá la acusada."

Solicitó la defensa la reconsideración y mientras la fundamentaba, le interrumpió el juez en los siguientes términos:

"HON. JUEZ:

Compañero, no pierda más tiempo. El Tribunal creyó la prueba de El Pueblo. Especialmente la del señor Celedonio Muñiz, empleado del correo, que la oye a ella espontánea, en el momento de la conmoción, donde surgen los mismos hechos. Cuando es sorprendida por él y la agarra y agarran al esposo y dice que 'lo suelten a él, que él no es culpable, la culpable soy yo, y yo he hecho los disparos.' Esas manifestaciones sinceras y espontáneas las ha creído el Tribunal. La explicación que ella dio sobre el porqué las dijo, no las ha creído el Tribunal. Por eso, cree y entiende el Tribunal que hay prueba suficiente, fuera de toda duda razonable, para condenarla. Y que además, la prueba sobre el 'corpus delicti' es abundantísima en los tres casos. Si el jurado no creyó la prueba, o la entendió de otra manera, o quiso favorecer a la acusada con un veredicto absolutorio por piedad o por lo que fuera, el Tribunal ni puede, ni debe ni tiene que sujetarse a la resolución del jurado. Sincera y honestamente el Tribunal entiende que la acusada es culpable fuera de toda duda razonable. Por eso, es que la ha declarado culpable en éstos casos. De modo que declara sin lugar la moción de reconsideración del compañero."

Posteriormente la defensa presentó un escrito que intituló "Moción Solicitando Celebración de un Nuevo Juicio", a la cual se opuso el fiscal. Se denegó un nuevo juicio. Empero, el juez reconsideró su fallo sobre el segundo cargo de la posesión y dominio del revólver por parte de la acusada sin licencia y la absolvió de esa infracción al Art. 6 de dicha ley.

En cuanto al tercer cargo restante, según consta de la minuta del 29 de setiembre de 1967,

"Entiende el Tribunal que la prueba presentada en la causa M-67-243 sostiene dicho delito y deja en toda su fuerza y vigor el fallo dictado."

Se dictó sentencia por la infracción al Art. 32 (a) de la Ley de Armas de Puerto Rico, imponiendo a la acusada un año de cárcel. Habiendo rendido el oficial probatorio un informe "favorable a los intereses de la acusada" el tribunal suspendió los efectos de la sentencia permitiendo cumplir la misma en libertad a prueba mientras cumpliera con las nueve condiciones impuestas por el tribunal.

En este recurso la apelante señala la comisión de los siguientes errores:

### "PRIMER ERROR

*Cometió error de hecho y de derecho el Tribunal de instancia al declarar culpable a la acusada de una violación al artículo 32 (a) de la Ley de Armas basándose únicamente en las admisiones o confesiones extrajudiciales que ella hizo en la oficina del correo a raíz del incidente ocurrido en el mismo.*

### SEGUNDO ERROR

*Cometió error de derecho el Tribunal de instancia al admitir en evidencia una cartera que, según el testigo Celedonio Muñiz, apareció en uno de los buzones que el correo tiene en distintos sitios de la ciudad de Mayagüez como dos semanas antes del día de la celebración del caso, sin que se hubiese establecido una verdadera cadena en la posesión de dicha cartera y sin que la misma hubiese sido sometida a examen pericial para averiguar*

*que los dos agujeros que aparecían en ella hubiesen sido ocasio-
nados por disparos de armas de fuego.*

## TERCER ERROR

*Erró el Tribunal de instancia al negar la petición de la acu-
sada al efecto de que la cartera fuera sometida a examen pericial
antes de que se dictara sentencia en contra de ella."*

Antes de proceder al estudio de los errores señalados,
insertamos en esta ponencia la siguiente relación de la evi-
dencia aportada en juicio por ambas partes que en su informe
hace el propio Procurador General:

"La prueba del Pueblo consistió en el testimonio de la Sra.
María L. Minguela, la cual, en síntesis, declaró que el 24 de
febrero de 1967 alrededor de las 6 a 6:30 de la tarde se en-
contraba en el correo de Mayagüez, a donde fue a buscar corres-
pondencia. (T.E. pág. 8.) Mientras leía una carta que recibió
ese día llegó el esposo de la apelante y se pusieron a conversar.
Conversaban cuando llegó al correo la apelante y le inquirió a
su esposo sobre qué hacía allí. Al éste no contestarle, le preguntó
a ella en cuanto a qué le decía él; contestándole la testigo que
él le estaba diciendo que era su deseo divorciarse, pero que la
apelante no le concedía el divorcio. La apelante le dijo que ellos
vivían salvajemente y acto seguido le enseñó algo que tenía negro
en hombro y le dijo a la testigo 'Mira esto me lo hizo él'. Con
motivos de eso el esposo dijo 'Mentira, eso no te lo hice yo,
ahora sí me voy a divorciar'. Entonces ella abrió una cartera con
un ademán de coraje y él se le abalanzó encima y forcejearon.
En el forcejeo sonaron dos detonaciones. Continuaron force-
jeando después que sonaron las detonaciones y el esposo de la
apelante le dijo a la declarante que a él le habían hecho daño,
que se fuera para que no le hicieran daño a ella. La testigo no
vio arma alguna en manos de Arsenio González Seda, esposo de
la apelante, ni en manos de la apelante. Las únicas personas
allí presentes eran ellos tres. Esto ocurrió en el salón donde
estaban los buzones. (T.E., págs. 9–11) Cuando Arsenio Gon-
zález dijo que se iba a divorciar, estaba nervioso y violento.
(T.E., págs. 22, 28)

Celedonio Muñiz Rodríguez declaró que es empleado del co-
rreo de Mayagüez; (T.E., pág. 36) que el 24 de febrero de 1967

como de 7 a 7:15 de la noche actuaba de supervisor en la oficina y sintió dos detonaciones. Inmediatamente salió corriendo y abrió la puerta que da acceso al sitio de donde había oído las detonaciones y encontró a la apelante y su esposo en un forcejeo; que la agarró a ella y ésta dijo 'Suélteme y déjelo ir a él porque yo soy la única culpable, yo fui la que dí los tiros'; que él le preguntó por el arma y ella contestó que no sabía; que en eso llegó un compañero de trabajo y entre los dos lograron separarlos. (T.E., págs. 37–39) La apelante repitió iguales manifestaciones al compañero de trabajo que llegó, y luego a la policía y que esas manifestaciones las dijo ella voluntariamente. (T.E., pág. 41) Esto ocurrió en la Oficina del Correo en la parte del frente donde están los apartados. (T.E., pág. 37) Hacía dos semanas, mientras trabajaba por la noche, encontró la cartera encima de su escritorio. (T.E., págs. 42–43) La cogió en las manos y reconoció inmediatamente que era la cartera que tenía la apelante el día de los hechos, porque tenía dos perforaciones de tiro. (T.E., págs. 43–44) Se marcó la cartera como identificación 1 del Pueblo. (T.E., pág. 45) El testigo identificó también varias fotografías de la oficina postal del Correo de Mayagüez, de un zafacón y de una pared, donde ocurrió el impacto de las balas. (T.E., págs. 45–47) Los impactos de las balas estaban más abajo de un apartado, en una lozeta como de azulejos como a 6 pulgadas del piso. (T.E., pág. 49) La cartera apareció en un buzón y el cartero que la encontró la llevó al correo. Inmediatamente lo notificó al fiscal. (T.E., págs. 52–53) El testigo asegura que es la misma cartera, porque tenía las dos perforaciones y era del mismo material que dejó en el piso las partículas de las balas cuando salieron. (T.E., pág. 54) La apelante ni su abogado tenían manera de saber que la cartera había aparecido. (T.E., págs. 55–56)

El testigo José Enrique Ruiz declaró, en síntesis, que el 24 de febrero de 1967, alrededor de las 6 a las 7 de la noche mientras trabajaba en el interior del Correo sintió dos disparos; que Celedonio Muñiz salió inmediatamente afuera y él lo siguió; que cuando salió encontró a la apelante y su esposo forcejeando; que al salir la apelante dijo 'aquí no sucedió nada, quien disparé fui yo.' (T.E., pág. 58) Al salir afuera vio solamente a ellos dos y no vio armas en manos de ninguno. (T.E., pág. 59)

Eduardo Silva declaró ser policía estatal y que el 24 de febrero de 1967 con motivo de una querella se personó al Correo

de Mayagüez. (T.E., pág. 73) Pudo observar que en la parte inferior de la pared había un impacto de bala; que a dos a tres pies del impacto había dos plomos achatados en el piso; que continuó su investigación y envuelto en un zafacón que había al lado de una mesa encontró un revólver Colt, cañón corto, cargado con cuatro balas y dos casquillos disparados. (T.E., págs. 64-65) Identificó los plomos, el cañón y los casquillos. (T.E., págs. 66-67) La apelante espontánea y voluntariamente, sin que se lo preguntara, le dijo que ella había sido la que había disparado. (T.E., pág. 67) El testigo pasó el dedo por encima del cañón del revólver y al lado del gatillo notó como un carbón, como pólvora. (T.E., pág. 69)

Luego de este testimonio el fiscal presentó todas las identificaciones del Pueblo y una licencia para tener y poseer arma de fuego del Sr. Arsenio González Seda, esposo de la apelante, la cual correspondía al revólver presentado en evidencia. (T.E., págs. 69-70) La defensa objetó la admisión en evidencia de la cartera porque no se había probado una cadena con la posesión de la misma (T.E., págs. 70-71) y se allanó a la admisión del resto de la prueba. El juez admitió toda la prueba ofrecida. (T.E., pág. 71)

Como prueba de defensa, declaró la apelante. En síntesis, dijo que hacía dos [*sic*] años estaba casada con Arsenio González. (T.E., pág. 76) El día de los hechos subió al correo a echar una carta. Cuando salió vio a su esposo hablando con la señora Minguela. (T.E., pág. 78) Le preguntó a su esposo qué hacían allí y éste le contestó que nada. La señora Minguela le dijo que Arsenio seguía con el propósito de divorciarse de la apelante para casarse con ella, ya que ellos no vivían juntos. La Sra. Minguela le preguntó por qué no le daba el divorcio a Arsenio, a lo que la apelante le contestó que él no le había pedido el divorcio y que ellos vivían juntos. La testigo le enseñó a la Sra. Minguela una hematoma que Arsenio, su esposo, le había hecho en un hombro, lo cual dijo fue sexualmente. Arsenio negó haberle hecho el hematoma y dijo 'Ahora tú vas a tener que darme el divorcio'; Arsenio se enfureció y le dijo que se fuera que la iba a matar. Ella le brincó encima y forcejeó con él porque sabía que él tenía un arma. En el forcejeo sonaron las detonaciones. Aseguró la testigo que *él no disparó* y bajo el nerviosismo se sintió perdida, su hogar destrozado y quiso echarse

la culpa; que ella no llevó ese revólver a la oficina del correo; que nunca lo ha tenido en sus manos y no lo disparó. (T.E., págs. 79–81) Declaró que sabía que Arsenio tenía ese revólver porque hacía un mes habían robado la casa de ellos y desde entonces él andaba con el mismo. Señala que se echó la culpa por el nerviosismo y porque estaba defraudada al él demostrarle que el hogar y sus hijos no significaban nada; que entonces ella se dijo para sí 'Yo no le hago falta a ellos porque yo no trabajo, él hace más falta que yo'. (T.E., págs. 82–83) Negó que la cartera presentada en evidencia fuera de ella. (T.E., pág. 83) Aseguró que Arsenio fue el que escondió el revólver en el zafacón. (T.E., pág. 84) A pesar de que hay un buzón afuera del Correo echó la carta que llevaba, adentro porque tenía una noticia importante para dársela a su hija y quería que la timbraran y saliera ligero. Explicó como fue el forcejeo entre ella y su esposo. (T.E., págs. 97–98, 100) Enfatizó que en ningún momento tocó el revólver; que siempre lo tuvo su esposo sin ella tocarlo. (T.E., pág. 100) Repitió que cuando salió el testigo Celedonio Muñiz se echó la culpa porque sintió que su hogar estaba destrozado. (T.E., págs. 103–104)."

I—A la luz de la reseñada evidencia de cargo aportada en el juicio y conforme a nuestras decisiones sobre el punto, entre ellas *Pueblo* v. *Hernández*, 75 D.P.R. 907, 916 (1954) y *Pueblo* v. *Campos Suárez*, 86 D.P.R. 310, 316 (1962), consideramos que el *corpus delicti* había quedado suficientemente establecido y, por ello, que el primer error no fue cometido.

II y III—Los errores segundo y tercero que se refieren a la admisión como evidencia de cierta cartera y a la negativa de que la misma fuera sometida a examen pericial.

La existencia de una cartera en manos de la apelante Ramonita Sánchez en los momentos en que ella y su marido Arsenio González forcejeaban violentamente en el correo de Mayagüez, fue establecida por el testimonio de María Minguela.(1) Pero en modo alguno se demostró su color, tamaño,

(1) La Minguela estaba en trámites de divorcio de su esposo Héctor Acevedo, residente en Nueva York. Arsenio González, para entonces, trataba de que su esposa Ramonita Sánchez "le diera el divorcio". Arsenio y la Minguela se casarían tan pronto se libraran de sus respectivos esposa

forma y material de su fabricación. Sólo se hizo relación a la "cartera".

Los dos empleados del correo que enseguida llegaron al sitio donde estaban la apelante, su esposo y la amiga de éste, no permiten que de allí salieran la apelante y su esposo. Llaman la policía. Poco después llegan al lugar el sargento Vasallo con los policías Aníbal Pérez y Eduardo Silva "a investigar lo que estaba sucediendo en el correo." La policía habla con todas las personas que están en el correo, hacen registros y encuentran en un zafacón un revólver y en el piso dos plomos achatados. Toman fotografías de los impactos de balas. Pero en forma alguna, ocupan o hallan la cartera.

Los hechos ocurren el 24 de febrero de 1967. Cuatro meses después en 22 de junio, se celebra el juicio.

Dos semanas antes del juicio, es decir por allá por el día 8 de junio, Celedonio Muñiz, empleado del correo que declaró en juicio, mientras trabajaba de noche encontró *sobre su escritorio* una cartera; entonces, según él declaró, ". . . cogí la cartera y cuando cogí la cartera en la mano . . . pregunté por la cartera me dijeron ellos. . . . . . . La reconocí inmediatamente que era la cartera porque . . . con la cual estaba la noche de los hechos . . . *porque tenía dos perforaciones de tiro.*"

Es algo curiosa la conducta de Muñiz: demostró mucho interés en que se investigaran los hechos en la noche del 24 de febrero. Tan pronto llegó al sitio empezó a interrogar a la apelante, le preguntó sobre el arma, ella le contestó "yo no sé"; y, según declaró Muñiz: "Entonces empezamos a forcejear ahí hasta la puerta, pero en eso llegó un compañero

---

y esposo. Como ésta dijo en juicio ". . . lo quiero . . . si se divorcia me caso con él." T.E. pág. 21. Cuando en el correo la apelante le preguntó a ella de qué hablaba con su esposo Arsenio, le contestó:

". . . que él me estaba diciendo lo mismo que seguía en su propósito. Que él me estaba diciendo que se iba a divorciar y que ella no quería dar el divorcio." T.E. pág. 9.

mío y yo le dije 'cógelo a él, yo la agarro a ella' para que no se me vayan; porque se me querían ir, ve." A pesar de todo ello y de haber tenido en sus manos, según él, la cartera con las "dos perforaciones de tiro", no se la entrega a la policía, ni suministra a ésta información alguna sobre la cartera.

Se le preguntó por la defensa "¿Dígame, testigo, le dijo usted a la policía o al fiscal en esa noche que usted había visto alguna cartera allí?" Contestó: "No recuerdo . . . Que no recuerdo . . . si lo dije no lo recuerdo." T.E. pág. 51.

Se le interrogó cómo había aparecido, dos semanas antes del juicio, la cartera. Explicó que un cartero del correo, cuyo nombre no pudo decir "la dejó en la oficina postal . . . en el escritorio donde yo estaba trabajando."

Ningún otro testigo corroboró lo dicho por Celedonio Muñiz sobre la cartera. Ni siquiera fue traído el llamado cartero que "la encontró en un buzón de una calle de Mayagüez" y la dejó encima del escritorio de Muñiz. Tampoco pudo dar su nombre. En esa ocasión, faltando pocos días para el juicio la entregó al fiscal. La acusada apelante y su abogado vienen a conocer de la existencia de la cartera "que tenía dos perforaciones de tiro", en el momento del juicio en que declara Celedonio Muñiz. Sobre esto no hay controversia alguna. Tal circunstancia significativa, la relaciona en su informe el Procurador General.

Son también curiosos los dos rotos que aparecen en uno de los lados plegadizos de la cartera. Hemos calcado esas dos aberturas y las mismas aparecen así:

La defensa preguntó al testigo Muñiz si él aseguraba que las dos perforaciones eran de balas por haberlas sometido a algún análisis. Contestó que no.

Posteriormente el letrado de la acusada mientras objetaba que el fiscal usara el término "perforaciones", manifestó al tribunal ". . . aquí nadie ha probado, ningún perito, ni nadie, ni nada, que eso sean perforaciones y mucho menos de bala."

El acto del pronunciamiento de la sentencia fue pospuesto para el 22 de setiembre de 1967. En el día 18 de ese mes, la defensa presentó su escrito sobre nuevo juicio en que, entre otras cosas, alegó:

"2.—Entiende muy respetuosamente la acusada que el Tribunal cometió error de derecho al admitir en evidencia una cartera que, según el testigo Celedonio Muñiz declaró, apareció en uno de los buzones que el Correo tiene en distintos sitios de la ciudad de Mayagüez como dos semanas antes del día de la celebración del juicio en este caso, sin que se hubiese establecido una verdadera cadena en la posesión de dicha cartera y sin que la misma hubiese sido sometida a examen pericial para demostrar que los dos agujeros que aparecen en dicha cartera hubiesen sido ocasionados por disparos de arma de fuego.

En relación con dicha cartera presentada y admitida en evidencia la acusada solicita formalmente que en bien de la justicia

la misma sea sometida a examen pericial por cualquiera de los peritos de la División de Investigación Criminal de la Policía de Puerto Rico, con la asistencia de un perito que designaría la acusada, proponiendo la acusada que se examinen los llamados agujeros que presenta la tal cartera admitida en evidencia, para ver si tiene residuo alguno de pólvora, y proponiendo además que por los peritos a designarse y con el mismo revólver del esposo de la acusada que fue admitido en evidencia y con dos de las balas de dicho revólver que también se admitieron en evidencia, se hagan, en el lugar apropiado, dos disparos dentro de la cartera para que se vea el resultado y la clase de perforaciones que dos disparos con esa arma de fuego o cualquiera otra arma de fuego de ese calibre ocasionarían en esa cartera o cualquiera otra cartera de las mismas circunstancias.

Alega la acusada que no tuvo ella antes del juicio oportunidad alguna de solicitar que esa cartera fuera sometida al examen pericial que ahora solicita, porque no tuvo conocimiento de que se iba a presentar en evidencia en su contra dicha cartera hasta el mismo día del juicio. Véase Transcripción de Evidencia, página 55, cuando el fiscal cierra su interrogatorio al testigo Celedonio Muñiz."

Como antes se ha expresado, se denegó el nuevo juicio, pero el juez reconsideró su fallo respecto a la imputada infracción del Art. 6, absolviendo de la misma a la apelante.

El tribunal admitió la cartera como evidencia de cargo, por la identificación que de la misma hizo en juicio Celedonio Muñiz, ya que este testigo aseguró reconocerla como la que portaba aquella noche la acusada y que él la tuvo en sus manos. Al tomar como ciertas tales aseveraciones de Muñiz, surgió un motivo para su admisión.

Pero de lo que no estamos enteramente satisfechos, fuera de toda duda razonable, es de la certeza de la afirmación de Celedonio Muñiz en el sentido que los "boquetes" como dijo el juez, o los "hoyos" según la defensa, o las perforaciones, como señalaba el fiscal, sean la consecuencia inevitable y natural de las precisas dos detonaciones, disparos o tiros oídas

o hechos en el curso del forcejeo violento entre marido y esposa por la posesión del arma en el correo de Mayagüez.

La cartera que llevó Muñiz al fiscal pocos días antes del juicio, como demuestra el grabado anterior, tiene dos aberturas, que hemos señalado con las letras A y B. Obviamente, para cualquier persona normal, la A no responde a la probable huella de una bala calibre 38, ni de ningún otro calibre. La abertura B en cambio, pudo haber sido hecha por perforaciones de balas o con cualquier instrumento cortante, pero bastante embotado, como una tijera.

Ahora bien, lo que no se explica, si se disparó desde la cartera, es el estado en que se encuentran sus dos forros interiores. Están intactos en la parte frente o cercana a las dos aberturas. El lado plegadizo de la cartera mide unas 8 pulgadas de alto. Tiene el forro principal unos tres pequeños rotos situados a unas 6 pulgadas de altura de las dos aberturas del exterior de la cartera.

Ante esas condiciones de la cartera, sin un previo análisis pericial de la misma, su valor probatorio a los fines de demostrar que sus dos aberturas responden a los tiros o disparos precisos surgidos de aquel forcejeo, es muy dudoso. Por esa razón la impresión de corrección, de probabilidad o de posibilidad de corrección, que las aseveraciones del testigo Muñiz hizo en la conciencia del juzgador, merecían, a juicio nuestro ser confirmadas, si ello era factible, por el resultado del examen pericial solicitado.

■ Creemos que el segundo error no fue cometido. Respecto al tercero y último error señalado, nuestra conclusión es distinta. Ante la petición sobre un nuevo juicio fundada en no haberse sometido la cartera a un análisis pericial previo, a los efectos de su admisión como evidencia, y de pesar y apreciar su valor probatorio, frente a todas las circunstancias concurrentes en este caso, el tribunal, si no encontraba fundamentos para el nuevo juicio, debió haber dejado sin efecto

también su declaración de culpabilidad de la apelante en cuanto a la infracción al Art. 32 (a) de la Ley de Armas y continuar el juicio comenzado el 22 de junio, para darle la oportunidad a la acusada de traer prueba pericial sobre las llamadas perforaciones de esa cartera, cuya inesperada presentación como evidencia de cargo tuvo que constituir una sorpresa para ella y su letrado. Por la continuación del juicio ningún perjuicio se ocasionaba a las partes. Fue un error haber negado la oportunidad del análisis pericial.

Pero no se debe disponer del presente recurso devolviendo el caso para la continuación del juicio ante el tribunal de instancia, toda vez que, luego de estudiar a fondo la evidencia presentada, concluimos que los hechos probados no constituyen una violación al Art. 32 (a) de la Ley de Armas de Puerto Rico que, en lo pertinente, previene:

"Salvo en casos de defensa propia o de actuaciones en el desempeño de funciones oficiales, será culpable de delito menos grave toda persona que:

(a) *Voluntariamente dispare* cualquier . . . revólver u otra arma de fuego . . . en un sitio público o en cualquier otro sitio donde haya alguna persona que pueda recibir daño, aunque no se cause daño a persona alguna;" (Énfasis suplido.)

La pena fijada por el Art. 41 de la Ley de Armas a la infracción del Art. 32 (a) transcrito es un término mínimo de 30 días de cárcel y un término máximo de un año de cárcel. La apelante fue castigada, no obstante el favorable informe del oficial probatorio, con el mayor rigor de la ley.

■ Nuestro Código Penal en el Núm. 1 de su Art. 559, da la siguiente significación a la palabra "voluntariamente" —como traducción al castellano del término inglés *"wilfully"*;

"1. Wilfully. La palabra *'wilfully'* (voluntariamente), aplicada a la intención con que se ejecuta un acto, o se incurre en una omisión, implica simplemente *propósito o voluntad de cometer el acto, o de incurrir en la comisión a que se refiere."* Énfasis suplido.

"Voluntario", según el Diccionario de la Lengua Española, es el acto que nace de la voluntad, y no por fuerza o necesidad extrañas a aquélla. "Voluntad", se define allí como intención, ánimo o resolución de hacer una cosa; gana o deseo de hacer una cosa.

Repasemos, en parte, el cuadro de circunstancias que surgen de la evidencia aportada. Ramonita Sánchez Lugo lleva 12 años de casada con Arsenio González Seda; han procreado una hija de 9 años y un hijo de 7 años; en la tarde del día 24 de febrero de 1967 fue con su cuñada, hermana de su esposo, a un salón de belleza, porque por la noche iría con su esposo y sus hermanos a un baile; después de salir del salón de belleza condujo a su cuñada a un hotel de Mayagüez donde ésta se hospedaba en ocasión de su visita a Puerto Rico; al llegar al hotel la cuñada le encargó que le echara una carta al correo; le entrega la carta y la apelante se fue a echarla; llegó al correo y echó la carta; cuando salía del correo vio a su esposo Arsenio González Seda hablando allí con María Luisa Minguela.

Dejemos que esta única testigo presencial—siguiendo la Transcripción de Evidencia—nos relate lo que sigue ocurriendo:

"R—Cuando estábamos conversando llegó su señora esposa al correo. Y entonces le preguntó a él que hacía allí. El no le contestó nada. El le dijo a ella que se fuera y ella no se fue y se quedó allí. Me preguntó a mi que; que me estaba diciendo él. Entonces yo le dije que él me estaba diciendo lo mismo que seguía en su propósito. Que él me estaba diciendo que él se iba a divorciar y que ella no le quería dar el divorcio.

P—Entonces que pasó, que dijo ella, si es que dijo algo? Después que usted . . . .

R—Entonces después que yo le dije eso, lo que él me había dicho. Ella dijo que ellos vivían, que ellos vivían salvajemente. Que estando él enfermo en la clínica con suero puesto ellos habían vivido en la clínica y entonces enseñó algo que tenía negro aquí en el hombro y me dijo 'mira esto me lo hizo él'.

P—Entonces, qué hizo él cuándo ella hizo eso?

R—El dijo 'mentira, eso no te lo hice yo. Ahora si que me voy a divorciar'. Entonces ella abrió la cartera en un ademán de coraje y él se le abalanzó encima y forcejearon y cuando en el forcejeo sonaron las detonaciones.

P—Que le dijo él . . . que decía ella mientras forcejeaba?

R—Ella solamente dijo 'ah! si, ah! si.' Ella no dijo nada más. Porque ella forcejearon [*sic*] y ella no dijo nada más.

P—Ah! si, ¿cuántas veces dijo 'ah! si?'

R—Dos veces, ah! si, y abrió la cartera y entonces cuando forcejearon no decían nada ninguno de los dos.

P—¿Entonces qué ocurrió mientras ellos forcejearon . . . qué hizo usted?

R—Sonaron dos detonaciones. Yo estaba todavía en el correo, estaba allí. Y ellos siguieron forcejeando después que sonaron las detonaciones todavía ellos siguieron forcejeando y entonces yo me iba a ir y él me dijo que me fuera, que a él le hicieran daño, 'que me haga daño a mi, pero que a ti no te haga daño.' Yo me fui y me paré en la puerta. Todavía ellos estaban forcejeando. Yo dije, 'eso se le debe de decir a la policía'. Pero entonces salí del correo y no fui donde la policía. Seguí para casa de mi hermana que vive en Cristi, una hermana que tengo casada allí. Y allí encontré a mi hermano y él me llevó a casa. Y allí en casa se lo conté a mi hermano lo que había sucedido y se lo conté a mi hermana también.

P—Usted vio arma allí en manos de persona alguna?

R—No, señor.

P—Usted vio arma alguna, en manos específicamente del señor Arsenio González Vera?

R—No, señor.

P—Y en manos de Ramonita Sánchez?

R—No, señor.

P—Había alguna otra persona allí en el correo en ese momento cuando ocurrió eso?

R—Yo no vi ninguna otra persona.

P—¿Solamente ustedes tres?

R—Sí, señor."

.    .    .    .    .    .    .    .    .

LIC. FREYRE:

P—¿Y usted no vio revólver en manos de nadie?

R—No, señor.

P—¿Ni vio a nadie disparar?
R—No, señor."

Los testigos Celedonio Muñiz y José Enrique Ruiz, empleados del correo, oyen las dos detonaciones y enseguida van al salón público principal. Allí encuentran forcejeando a los esposos González-Sánchez entre sí. Tienen que hacer un esfuerzo para separarlos.

Ante estos dos testigos es que la apelante, en el estado en que se encuentra y sin persona alguna que la aconseje, se echa la culpa y asume las consecuencias o responsabilidades de los disparos.

A base de estos hechos no pudo en forma alguna quedar establecido, como reza la acusación, "La referida acusada, en la fecha, sitio y circunstancias expresadas, ilegal, *voluntaria*, maliciosa e intencionalmente, hizo varios disparos de revólver . . . en presencia de personas que podían recibir daño corporal y sin ser ello en caso de defensa propia . . . ."

Nadie vio un arma de fuego en manos de la acusada. Como declaró la Minguela fue en los momentos en que ella trató de abrir la cartera que su esposo Antonio González mete sus manos en la misma cartera, produciéndose el violento forcejeo en medio del cual suenan las dos detonaciones. El forcejeo continuaba al presentarse en el lugar los testigos Muñiz y Ruiz, quienes tienen que luchar por separarlos. Si el arma estaba en la cartera, lo que siempre negó la apelante, lo más probable fue que en esos trágicos momentos de violencia, angustia y ansiedad el arma se disparara accidentalmente. ¿Quién puede infaliblemente asegurar, cuando dentro de una cartera con un revólver, se mueven desesperadamente manos de personas distintas para agarrarlo, que las detonaciones que entonces se oyen no fueron accidentalmente producidas y sí voluntariamente?

■ A juicio nuestro no se presentó evidencia que produjera la certeza moral de que la apelante, bajo la hipótesis

de que ella hiciera los disparos, los hizo voluntariamente o con la intención o deseo de así hacerlo. El Art. 32 (a) no contempla disparos que puedan hacerse en el curso o con ocasión de una riña o lucha corporal. Cuando tal cosa ocurre se infringe el Art. 370 de nuestro Código Penal.[2]

En *Pueblo* v. *Aquino*, 79 D.P.R. 18 (1956), como en el presente caso, se imputaron al acusado, una infracción al Art. 6, otra al Art. 8 y otra al Art. 32 (a) de la Ley de Armas de Puerto Rico. Como ocurrió en el presente caso, se celebraron los juicios conjuntamente, juzgándose por jurado la infracción grave y las menos graves por tribunales de derecho. El jurado absolvió a Aquino del delito grave; el juez también lo absolvió del delito previsto por la Sec. 6, pero lo declaró culpable de la infracción al Art. 32 (a). Se le impuso la pena mínima de treinta días de cárcel.

La evidencia presentada por Aquino, no creída por el tribunal, tendió a demostrar que otra persona, de apellido Arroyo, en estado de embriaguez, había entrado portando un revólver a un cafetín de Añasco donde estaba Aquino con unos amigos, trató de dispararlo en presencia de ellos, y el acusado "agarró el revólver y en lucha con él, forcejeando con el portador del arma, salieron unos disparos."

La prueba de cargo, por su lado demostró que a esa persona de apellido Arroyo su padre le había encomendado que llevara a su hogar un revólver en una bolsa de papel; que Arroyo, al dirigirse a su casa, entró a un cafetín donde estaba el acusado junto a varios amigos jugando barajas y tomando licor; que estando Arroyo en el cafetín "el acusado cogió el revólver . . . salió a la acera y disparó varios tiros";

---

[2] Dispone este Art. 370:

"Toda persona que sin ser un caso de necesaria defensa propia, *sacare o mostrare en presencia de dos o más personas*, algún arma mortífera, en actitud violenta, colérica y amenazadora, o *que de modo ilegal hiciere uso de dicha arma en alguna riña o pendencia*, incurrirá en delito menos grave." (Énfasis suplido.)

que ni antes ni después de los disparos allí hubo pelea, riña o discusión.(³)

Confirmamos la sentencia de treinta días de cárcel impuesta a Aquino. Dijimos en ese caso:

"[1] El primer error no fue cometido. Es innecesario hacer un análisis detallado de la evidencia. Basta decir que el testimonio presentado por el Pueblo demuestra que sin justificación alguna el acusado hizo varios disparos con un revólver mientras se encontraba en la acera de una calle en Añasco. El tribunal sentenciador no dio crédito al testimonio de los testigos de defensa al efecto de que el revólver se disparó mientras el acusado y un tal Eytón Arroyo forcejeaban por la posesión del mismo. No encontramos base en los autos para intervenir con la apreciación que de la evidencia hizo el tribunal a quo en este caso.

[2, 3] En cuanto al segundo error, no podemos convenir en que los hechos demuestran una infracción del art. 370 del Código Penal más bien que del art. 32(a) de la Ley de Armas. El art. 370 declara delito menos grave el hacer uso de un arma mortífera 'en alguna riña o pendencia.' En este caso la prueba creída por el tribunal sentenciador fue que el acusado no estaba envuelto en ninguna riña o pendencia cuando hizo los disparos con el revólver. Por consiguiente, el tribunal a quo decidió correctamente que bajo dichas circunstancias los hechos constituían una infracción del art. 32(a) de la Ley de Armas."

■ Si se hubiera demostrado debida y satisfactoriamente que Aquino efectivamente hizo los disparos conforme a su versión del caso, probablemente hubiéramos revocado el fallo condenatorio, por haber ocurrido los disparos accidentalmente, no voluntariamente como exige el Art. 32(a) por infracción del cual se le enjuició.

En el presente recurso de Ramonita Sánchez Lugo, no hay controversia alguna de que los disparos ocurren en ocasión y curso de un forcejeo por la posesión y dominio de un arma de fuego, bien ésta se hallara originalmente en manos del esposo Arsenio González, como sostuvo siempre su esposa

---

(³)Algunos detalles del caso de Aquino los hemos tomado del expediente del recurso criminal Núm. 16,036, que consta en nuestros archivos.

(él la tenía inscrita a su nombre—Exh. X, de El Pueblo) o bien el arma se hallara dentro de alguna cartera poseída por la apelante. ([4])

*Se revocará la sentencia apelada.*

---

([4]) El revólver apareció dentro de un zafacón existente en el salón del correo en que ocurren los hechos. En todo momento la acusada negó tener en su posesión el arma. Cuando llegan Muñiz y Ruiz al salón, segundos después de las detonaciones, ya el arma estaba dentro del zafacón. Cuando Celedonio Muñiz, en esos momentos, le preguntó a la apelante por el arma, luego de decirle ella que "era la única culpable", la apelante le contestó: "Yo no sé". (T.E. pág. 38)